**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

**HEARTFITT LLC,**

**Plaintiff,**

**v.**

**HEARTHERO, INC.,**

**Defendant.**

**Case No. 1:26-cv-940**

**JUDGE DOUGLAS R. COLE**

**OPINION AND ORDER**

HeartFitt LLC is suing HeartHero, Inc., for, among other things, a declaration that HeartFitt's app, Heart Hero Solo, does not infringe on HeartHero's trademark rights. (Am. Compl., Doc. 11). On September 17, 2026, the same day it filed the initial complaint, (Doc. 1), HeartFitt moved for a preliminary injunction and applied for a temporary restraining order (TRO) to enjoin any ongoing requests from HeartHero to either Apple or Google seeking to remove Heart Hero Solo from their respective app stores, (Doc. 3). The present order resolves only HeartFitt's TRO application. For the reasons explained below, the Court **GRANTS** that application.

**BACKGROUND**

According to HeartFitt's co-founder and CEO, Shannon Eads, the HEART HERO "platform," which includes the Heart Hero Solo mobile application, "turns cardiovascular exercise into an interactive game using a participant's real-time heart-rate data." (Eads Decl., Doc. 3-1, #147). The "platform" is already up and running, with several fitness centers adopting HeartFitt's technology. (*Id.* at #48). Also in the works is a trademark application. HeartFitt applied to register the

HEART HERO trademark in 2025. U.S. Trademark Application Serial No. 99/224,522 (filed June 9, 2025). The Trademark Office later published the mark and assigned it to an examiner after nobody opposed it. *See* U.S. Patent & Trademark Off., Trademark Search, *Heart Hero*, https://tmsearch.uspto.gov/search/search-results/99224522 [https://perma.cc/W7RU-5AGP]. That application remains pending.

As is the case for many growing businesses, at this tender age, "[e]very customer, facility, partnership and app download matters to HeartFitt enormously." (Doc. 3-1, #48). To raise capital, HeartFitt needs more subscribers. (*Id.*). That made it particularly disconcerting when HeartFitt became embroiled in takedown disputes with the Apple App Store, the Google Play Store, and HeartHero over Heart Hero Solo's possible conflict with defendant HeartHero's trademark rights. (*Id.* at #50–51).

HeartHero has a different story. According to its founder and CEO, Gary Montague, HeartHero is simply defending its turf. The company manufactures automated external defibrillators and provides an accompanying mobile app. (Montague Decl., Doc. 10-1, #132–33). In 2019, it obtained registration from the USPTO for two trademarks featuring the company's logo, a superhero with a lightning bolt in his heart-shaped chest with "HeartHero" (no space between the words) underneath in text. Reg. Nos. 5,644,175 & 5,874,969. While headquartered in the United States, HeartHero currently markets these products only abroad, as it has not yet received FDA approval (which it anticipates will come sometime in 2027) to sell its AED here. (Doc. 10-1, #135–36).

While HeartFitt's CEO assumed that there would be no issues because the two firms "operate[] in separate categories," HeartHero had a different view. (*Id.* at #137). Through its attorneys, it requested that HeartFitt abandon its current branding. (*Id.*). HeartHero is concerned that, once it does enter the U.S. market, "[t]he presence of another 'HeartHero' app in the field of cardiovascular health with a logo that looks very similar to our logo" would lead to customer confusion. (*Id.* at #139). Apart from goodwill concerns about mistaken assumptions that the two brands are affiliated, Montague worries that someone attempting to use the wrong app in connection with the AED may miss certain important notifications. (*Id.* at #140).

After months of fruitless negotiation, HeartHero decided to act unilaterally. It submitted takedown requests to the Apple and Google app stores. (*Id.* at #137). Google complied with the request, so HeartFitt's app is now unavailable on the Google Play Store. (Doc. 3-1, #51). Apple took a different tack. It directed the parties to resolve the matter with each other and "asked to be kept apprised" of their communications. (Doc. 10-1, #138).

Shortly after learning of the Google takedown, HeartFitt sued. In its Amended Complaint, it asserts four claims. The first seeks a declaratory judgment that it has not infringed on HeartHero's trademark rights. (Doc. 11, #213–14). Its second and third claims allege tortious interference with business relationships (prospective and ongoing) under Ohio law. (*Id.* at #214–15). For those two claims, HeartFitt seeks injunctive relief to prevent further interference. (*Id.* at #215–16). Finally, HeartFitt seeks cancellation of HeartHero's trademark based on its alleged non-use of that

mark in interstate commerce. (*Id.* at #217–18). The declaratory relief and cancellation claims arise under federal law, *see Skelly Oil Co. v. Phillips Petroleum Co.*, 339 U.S. 667, 671–72 (1950), and the Ohio law claims are closely related. HeartFitt moved for a preliminary injunction and applied for a TRO on September 17, 2026 (Doc. 3). That matter is now fully briefed (and then some). (*See* 10/2/2026 Not. Ord.). So the matter is ripe for decision, and the Court has subject-matter jurisdiction under 28 U.S.C. §§ 1331 and 1367.

## LEGAL STANDARD

The only issue currently before the Court is HeartFitt's application for a temporary restraining order. A TRO "is an extraordinary remedy that should only be granted if the movant can clearly show the need for one." *Kendall Holdings, Ltd. v. Eden Cryogenics LLC*, 630 F. Supp. 2d 853, 860 (S.D. Ohio 2008). Ultimately, "the purpose of a TRO under Rule 65 is to preserve the status quo so that a reasoned resolution of a dispute may be had." *Procter & Gamble Co. v. Bankers Tr. Co.*, 78 F.3d 219, 226 (6th Cir. 1996). Plaintiffs "bear[] the burden of establishing entitlement to a temporary restraining order." *Mesa Indus., Inc. v. Charter Indus. Supply, Inc.*, No. 1:22-cv-160, 2022 WL 1044720, at *4 (S.D. Ohio Apr. 7, 2022). "To satisfy this burden, [plaintiffs] must establish [their] case by clear and convincing evidence." *Id.* That in turn means that plaintiffs "may not merely rely on unsupported allegations, but rather must come forward with more than 'scant evidence' to substantiate their allegations." *Patel v. AR Grp. Tenn., LLC*, No. 3:20-cv-52, 2020 WL 5849346, at *4 (M.D. Tenn. Oct. 1, 2020) (collecting cases).

Whether a movant is entitled to this extraordinary relief is governed by the same four factors that apply to requests for preliminary injunctions. *See Moore v. Kempthorne*, 464 F. Supp. 2d 519, 525 (E.D. Va. 2006). Those factors are whether: (1) the movant has a substantial likelihood or probability of success on the merits, (2) the movant will suffer irreparable injury if the court does not grant relief, (3) injunctive relief would unjustifiably harm a third party, and (4) injunctive relief would serve the public interest. *Frisch's Rest., Inc. v. Shaney's Inc.*, 759 F.2d 1261, 1263 (6th Cir. 1985). A weak showing on the likelihood of success prong of the analysis is not dispositive. *Id.* at 1270. But in that situation, preliminary equitable relief is appropriate only if there are at least "serious questions going to the merits *and* irreparable harm" and that harm "decidedly outweighs any potential harm" a TRO would inflict on the defendant. *Id.* (quoting *Friendship Materials, Inc. v. Mich. Brick, Inc.*, 679 F.2d 100, 105 (6th Cir. 1982)).

## LAW & ANALYSIS

So how do those factors play out here? Taking all four together, the Court concludes that they point toward granting HeartFitt's requested TRO.

### A. The Likelihood of Success Factor Does Not Cut Strongly Either Way.

Admittedly, the first factor—HeartFitt's likelihood of success on the merits—does not point strongly in favor of granting relief. To see why, take the claims in order.

**1.** At present, based on the information currently available to the Court, HeartFitt's claim for a declaration of non-infringement does not appear either particularly likely or particularly unlikely to succeed. To establish trademark

infringement, a party must show "(1) that it owns a trademark, (2) that the infringer used the mark in commerce without authorization, and (3) that the use of the alleged infringing trademark 'is likely to cause confusion among consumers regarding the origin of the goods offered by the parties.'" *AWGI, LLC v. Atlas Trucking Co., LLC*, 998 F.3d 258, 264 (6th Cir. 2021) (quoting *Coach, Inc. v. Goodfellow*, 717 F.3d 498, 502 (6th Cir. 2013)). So, in the declaratory judgment context here, the Court must measure the likelihood that HeartFitt ultimately will succeed in showing that HeartHero cannot prove at least one of those three conditions.

In the context of the current motion, the parties dispute only whether HeartFitt's activity is likely to cause confusion with HeartHero's marks. To answer that question, the Court considers eight factors: (1) "strength of the [senior user's] mark," (2) "relatedness of the goods," (3) "similarity of the marks," (4) "evidence of actual confusion," (5) the parties' "marketing channels," (6) "likely degree of purchaser ca[r]e," (7) the junior user's "intent in selecting the mark," and (8) "likelihood of expansion of the product lines." *Frisch's*, 759 F.2d at 1264. The Court's job in applying this test is not to "balance[e]" the factors with "mathematical precision." *CFE Racing Prods., Inc. v. BMF Wheels, Inc.*, 793 F.3d 571, 592 (6th Cir. 2015) (quoting *Homeowners Grp., Inc. v. Home Mktg. Specialists, Inc.*, 931 F.2d 1100, 1107 (6th Cir. 1991)). Instead, the factors identify "the pertinent facts" bearing on "whether relevant consumers are likely to believe that the products or services offered by the parties are affiliated in some way." *Id.* at 592 (first quoting *Frisch's*, 759 F.2d at 1264; and then *Homeowner's Grp.*, 931 F.2d at 1107)).

Even with that helpful clarification, it would be difficult to state with conviction that HeartFitt is likely or unlikely to meet its burden under this eight-factor balancing test. Counting in favor of finding a likelihood of confusion, the Court notes the striking similarity between the marks and that they are used on closely related product lines (both parties attach the disputed mark to a mobile app). (*See* Doc. 10-1, #148 (showing the parties' marks next to each other)); U.S. Patent & Trademark Off., Trademark Search, *Reg. No. 5,874,969*, https://tmsearch.uspto.gov/search/search-results/87751454 [https://perma.cc/3BNJ-AXYZ] (listing "mobile application software" among the goods and services associated with HeartHero's registered trademark). But on the other hand, neither HeartHero's AED nor its corresponding app are available in the United States, making it hard to see how confusion would arise in this country. So some factors point toward a likelihood of confusion and some point away.

**2.** The likelihood of HeartFitt succeeding on its cancellation claim is also difficult to forecast. Of course, in the right circumstances, "[d]istrict courts can cancel registrations during infringement litigation." *B & B Hardware, Inc. v. Hargis Indus., Inc.*, 575 U.S. 138, 155 (2015). But in cases like this one, where the mark under attack was registered by the USPTO more than five years before the litigation,[1] cancellation is improper except where one of the specifically enumerated conditions set out in 15 U.S.C. §§ 1064(c) and (e) applies. *See Park 'N Fly, Inc. v. Dollar Park & Fly, Inc.*, 469 U.S. 189, 199 (1985). So, relevant here, HeartFitt must show either that HeartHero

[1] Both of HeartHero's marks were registered in 2019. *See* Reg. Nos. 5644175 & 5874969.

"abandoned" its mark or that HeartFitt obtained the mark's registration "fraudulently." 15 U.S.C. § 1064. For the latter, HeartFitt charges that HeartHero obtained its registrations without meeting the Lanham Act's requirement that they be placed on goods "sold or transported in commerce." *Id.* §§ 1127, 1051. For the former, which requires HeartFitt to show that HeartHero "discontinued with intent not to resume such use," *id.* § 1127, HeartFitt claims that HeartHero has "fail[ed] to use the mark in commerce for at least three consecutive years[,] which constitutes prima facie evidence of abandonment," (Doc 12, #228 (citing 15 U.S.C. § 1127)).

The current record does not provide an overwhelming amount of data on either of the two issues. The principal evidence comes from Gary Montague, HeartHero's founder and CEO. He contends, for example, that in 2018 the company "shipped [its] HeartHero AED to third-party partners in multiple states and overseas for evaluation and testing." (Doc. 10-1, #132). He further intimates, although does not expressly aver, that HeartHero engaged in "inter-state distribution of the HeartHero App" at the same time. (*Id.*).

In a second affidavit addressing more recent use, he states that "[s]ince 2020, there have been multiple rounds of human factor testing conducted by two independent vendors." (Doc. 14-1, #277). That testing occurred in Illinois, Pennsylvania, and Florida. (*Id.*). With the most recent testing occurring "this year" in Florida. (*Id.*). And he contends that HeartHero has made the app available through Apple's "TestFlight system" to third-party partners in many states. (*Id.*).

It is not entirely clear to the Court whether HeartHero's 2018 shipments to third-party partners for testing count as "use[s] in commerce" to support registration under the Lanham Act. 15 U.S.C. § 1051(a)(3)(C). But even assuming that HeartFitt is correct that they don't, the current facts also shed little light on HeartFitt's fraud allegation. Fraud under § 1064(3) presumably requires some showing of conscious deception. *See Fraud*, Black's Law Dictionary (12th ed. 2024) ("A knowing misrepresentation or knowing concealment of a material fact made to induce another to act to his or her detriment."); *In re Bose Corp.*, 580 F.3d 1240, 1243 (Fed. Cir. 2009) (requiring "proof of intent to deceive" to cancel a trademark registration for fraud under § 1064(3)). On that front, the Court's guess is as good as anyone's, but it would still be that—a guess.

The story on abandonment is much the same. HeartHero again relies on deliveries to third-party partners for testing (in the post-registration timeframe) to show that HeartHero has continued to use its mark. As just noted, such deliveries may constitute use, but even so, the 2020 to 2022 shipments do little to combat HeartFitt's claims of non-use in the last *three* years. True, the Florida deliveries were allegedly this year, but that still leaves a potential three-year gap between 2022 and 2026.

At bottom, on the record here, there are currently more questions than answers on the cancellation claim.

**3.** Finally, HeartFitt's likelihood of success on its Ohio-law tortious interference claims is also difficult to judge. To succeed on such a claim, HeartFitt

must show that HeartHero "intentionally and *improperly* interfered with" their business relations "by either (1) inducing or otherwise causing a third person not to enter into or continue the prospective relation, or (2) preventing [HeartFitt] from acquiring or continuing the prospective relation." *Couzens v. Union Bank & Tr. Co.*, 234 N.E.3d 661, 667 (Ohio 1st Dist. 2024).

Even assuming that the only live question is whether the alleged interference was improper, that still leaves an opaque picture. To see why, start with the test for whether an interference is improper, or in other words "without justification or privilege." *Alexander v. Motorists Mut. Ins. Co.*, 2012-Ohio-3911, ¶ 31 (Ohio 1st Dist. 2012) (first citing *Licul v. Swagelok Co.*, 2006-Ohio-711, ¶ 28 (Ohio 8th Dist. 2006); and then *Norwell v. Cincinnati*, 729 N.E.2d 1223, 1228 (Ohio 1st Dist. 1999)). To figure that out, Ohio courts consider seven factors:

> (a) the nature of the actor's conduct, (b) the actor's motive, (c) the interests of the other with which the actor's conduct interferes, (d) the interests sought to be advanced by the actor, (e) the social interests in protecting the freedom of action of the actor and the contractual interests of the other, (f) the proximity or remoteness of the actor's conduct to the interference, and (g) the relations between the parties.

*Couzens*, 234 N.E.3d at 667, 665; *see also* Restatement (Second) of Torts § 767 & cmt. a. (A.L.I. 1979). So the question is how those seven factors play out when the defendant asserts its trademark rights to interfere with the plaintiff's business prospects.

Perhaps surprisingly, there is little caselaw on the subject. HeartHero cites to cases holding defendants immune from liability when they merely assert intellectual property rights, (*see* Doc. 10, #116–17), but those holdings are based on an immunity

defense the Court discusses below, which may or may not apply. So put that aside for the moment. Armed with the knowledge that, under Ohio law, "the nature of the actor's conduct" is the "chief factor" for deciding tort liability, *Kand Med., Inc. v. Freund Med. Prods., Inc.*, 963 F.2d 125, 128 (6th Cir. 1992) (quoting Restatement (Second), *supra* § 767 cmt. c.), and little more, the Court is hard-pressed to identify a glaringly correct answer on the tortious interference claim. Most of the factors (if not all) would seem to turn on the merits of the underlying trademark dispute or HeartHero's mental state when asserting its infringement claim to Apple and Google. The record at this stage offers little on either of those fronts beyond bare assertions.

But, while the Court struggles to see why HeartFitt clearly wins on this claim, the cases that HeartHero cites as creating a slam-dunk defense likewise may not be the panacea HeartHero thinks they are. The cited cases all rest on the *Noerr-Pennington* doctrine. But it is an open question whether that doctrine covers HeartHero's conduct here. By way of background, the *Noerr-Pennington* doctrine originated in the antitrust law, and it generally immunizes parties from liability for petitioning the government, even if anticompetitive intent motivated their activity. *See E. R.R. Presidents Conf. v. Noerr Motor Freight, Inc.*, 365 U.S. 127, 135–36 (1961); *United Mine Workers of Am. v. Pennington*, 381 U.S. 657, 669–70 (1965). The Supreme Court adopted this interpretation of the antitrust laws because, in addition to the concern that such conduct "bear[s] little if any resemblance to the combinations normally held violative of the Sherman Act," permitting liability for petitioning

activity would "raise important constitutional questions" under the First Amendment. *Noerr*, 365 U.S. at 136, 138.

Courts have extended the immunity in two main ways. First, "[c]ourts, including the Sixth Circuit, have extended the *Noerr-Pennington* doctrine to anti-competition claims in trademark cases." *J.M. Smucker Co. v. Hormel Food Corp.*, 526 F. Supp. 3d 294, 308 (N.D. Ohio 2021) (quoting *Restoration Hardware, Inc. v. Bungalow Home, LLC*, No. 2:19-cv-4978, 2020 WL 4436357, at *3 (S.D. Ohio Aug. 3, 2020)). This includes "common law claims of tortious interference." *Campbell v. PMI Food Equip. Grp.*, 509 F.3d 776, 790 (6th Cir. 2007). Second, courts have also held that the immunity protects activity taken in anticipation of litigation, such as threats of suit, demand letters, cease-and-desist letters, and other communications about pending or planned litigation.[2]

At first glance, that seems to suggest that HeartHero is right that HeartFitt is unlikely to prevail on its tortious interference claims. But there are two reasons to hesitate. First, outside the antitrust context, it strikes the Court as at least a little odd if the *Noerr-Pennington* doctrine were to apply to conduct that does not fall within the constitutional right to petition. *See Cardtoons, L.C. v. Major League Baseball Players Ass'n*, 208 F.3d 885, 889–91 (10th Cir. 2000)). However important Apple and Google may have become, submitting a takedown request to their respective app stores is not "petition[ing] the government for a redress of grievances." U.S. Const.

[2] *See J.M. Smucker Co.*, 526 F. Supp. 3d at 308; *Ancestry.com Operations, Inc. v. DNA Diagnostics Ctr., Inc.*, No. 1:15-cv-737, 2016 WL 3999315, at *5 (S.D. Ohio July 26, 2016); *In re Cardizem CD Antitrust Litig.*, 105 F. Supp. 2d 618, 637 (E.D. Mich. 2000); *Rock River Commc'ns, Inc. v. Universal Music Grp., Inc.*, 745 F.3d 343, 351 (9th Cir. 2014).

amend. I. The second cause for concern is that it's debatable whether these takedown notices are sufficiently bound-up with litigation to invoke even an expanded version of *Noerr-Pennington* immunity that reaches litigation-associated conduct. True, HeartHero does offer a strikingly on-point case from this district. *See Ancestry.com*, 2016 WL 3999315, at *1–2, 5 (dismissing a tortious interference claim where the defendant's challenged conduct was submitting a trademark infringement complaint to Groupon, which in turn stopped creating and offering deals for the plaintiff's product). But, particularly considering the potential need for a close tie to First Amendment petitioning activity, the Court is not sure its own analysis would lead it down that same path.

*   *   *

The upshot is that the merits are murky. Indeed, that is often the problem in the TRO context. A court is asked to shoot from the hip on likelihood of success, based on a limited record, so it can often be expected to get that wrong. That is especially true where, as here, the claims are rife with factual uncertainties and open questions of law. As a result, the Court puts little stock in this TRO factor beyond noting that HeartFitt has at least some prospect of success.

### B. HeartFitt's Claimed Harm is Irreparable, and the Balance of Harms Clearly Favors Relief Given the Limited Remedy HeartFitt Seeks Here.

While the likelihood of success element is equivocal, the remaining (and in some ways more important) elements clearly and convincingly favor HeartFitt. Start with the nature of HeartFitt's harm. The harm that would occur if future

communications from HeartHero to Apple caused Apple to remove the Heart Hero Solo app from the Apple App Store is clear: users could not download the app at least in the time between now and the preliminary injunction hearing. This would compound the ongoing and future irreparable injuries of lost customer goodwill and diminished competitive position the Google removal inflicted. *See Mariner Wealth Advisors, LLC v. Savvy Advisors, Inc.*, No. 1:24-cv-351, 2024 WL 3466153, at *11 (S.D. Ohio July 19, 2024) (collecting cases); (*see also* Doc. 3-1, #54–55 (explaining the impossibility of calculating the value of these lost opportunities)).

The balance-of-harms factor also favors HeartFitt. That is especially so in light of the limited remedy it seeks here. All plaintiff seeks is an injunction essentially preventing defendant from taking further steps to remove Heart Hero Solo from the Apple App Store. (Doc. 3, #44). What is the harm to HeartHero from granting that relief? Precisely zero. HeartHero hasn't made their app available in the Apple or Google App Stores in the United States, and it is not even selling its product (the one with which a user might want the app) here. So there is no meaningful possibility that HeartFitt's desired relief would harm HeartHero in this country now. And the TRO can last, at most, 28 days. *See* Fed. R. Civ. P. 65(b)(2). So it is hard to see how much, if any harm could accrue to HeartHero during that time.

The same is true for HeartHero's theorized harm to the public interest. The Court can accept as true, at least as a conceptual matter, that coexistence of the two apps as currently branded threatens "worse outcomes in cardiac emergencies." (Doc.

10, #126). Even so, HeartFitt's requested temporary relief cannot possibly cause that harm because neither defendant's AED nor its app are available in the United States.

In short, the merits are murky and thus neutral while each of the remaining factors points decisively in HeartFitt's favor. So, at this preliminary stage, a TRO is appropriate.

That leaves the question of an appropriate bond. Generally speaking, when a court grants a TRO, it requires the beneficiary of the TRO to post a bond to offset the damage that the non-moving party accrues in the event it turns out that the court erred in granting the TRO. Fed. R. Civ. P. 65(c). Here, though, for the reasons already discussed, the Court concludes that HeartHero will not incur a harm as a result of the limited relief the Court grants here, even if it turns out the Court was wrong to do so. Accordingly, the Court concludes that HeartFitt need not post a bond.

The long and short is that HeartFitt seeks very limited relief that will not harm HeartHero in the short term, but that may provide measurable benefit to HeartFitt. Whether the TRO will ripen into a preliminary injunction is very much an open question, but it is a question that the Court should (and presumably will) answer on a fuller evidentiary record than what is currently before the Court.

## CONCLUSION

HeartFitt's Emergency Application for a Temporary Restraining Order (Doc. 3) is **GRANTED**. Specifically, effective October 14, 2026, the Court **ORDERS** that defendant and its agents refrain from issuing trademark enforcement communications regarding Plaintiff's current branding and trademark uses to Apple's or Google's mobile application stores.

**SO ORDERED.**

October 14, 2026
**DATE**

**DOUGLAS R. COLE**
**UNITED STATES DISTRICT JUDGE**